In re Michael W. FALZONE, Debtor.

Michael W. FALZONE, Plaintiff,

v.

Edward J. GATTA and Michael J. Gatta, Defendants.

Bankruptcy No. 86–154.
Adv. No. 86–95.

United States Bankruptcy Court,
D. New Hampshire.

June 29, 1987.

---

Joseph Szabo, Boston, Mass., Trustee.

Todd Whitney, Jordan & Gall, Hudson, N.H., for defendants.

Bertrand Zalinsky, Manchester, N.H., for plaintiff.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

This adversary proceeding is an attempt by the plaintiff-debtor to nullify certain notes and mortgages involved in a transaction by which he acquired in August of 1984, a restaurant operation known as "Primo's Restaurant" formerly owned by the defendants. The plaintiff operated the restaurant from September 1, 1984 to August 15, 1985. He ultimately filed his chapter 13 petition in this court on April 9, 1986.

The nub of the dispute is the plaintiff's contention that he was induced into buying the restaurant for a purchase price of $140,000 on the basis of the defendants' fraudulent assertions that the gross receipts of the debtor in 1983 were $314,000 when those receipts were only $239,000.

The defendants had listed the restaurant for sale with a broker and the plaintiff was put in touch with the defendants by that means. At the initial meeting between the parties the plaintiff inquired as to the gross business of the restaurant in 1983 and the defendants responded with the $239,000 figure shown in tax forms filed with the Internal Revenue Service for that year. The plaintiff inquired as to whether they *really* reported *all* of their cash receipts to the taxing authorities. The defendants responded that in fact they had grossed $314,000 in 1983 but some of the monies were handled "under the table".

Proceeding on this assertion, without any effort to otherwise check the actual cash receipts of the business, the plaintiff agreed to purchase the same at the $140,-000 price. The parties signed the first sales contract on May 28, 1984, which provided for the defendants taking back a $50,000 purchase money mortgage. The sales contract was however contingent upon the plaintiff getting $70,000 in financing from the Nashua Trust Company before the transaction, which together with other borrowings that the plaintiff intended to make would cover the $140,000 purchase price. The Nashua Trust Company how-

ever would agree to finance only $50,000, so the contract ultimately was renegotiated and a new sales contract was signed on July 23, 1984 for the same $140,000 purchase price but with the defendants taking back a $70,000 purchase money mortgage.

The transaction still could not be consummated because the Nashua Trust Company stated that it required some *signed* writing giving profit and loss figures for 1983. The financing by Nashua Trust Company was to be guaranteed up to 90% by the Small Business Administration. At this point the plaintiff went to the defendants and indicated this problem and advised that he had to have some signed writing to consummate the deal.

For obvious reasons the defendants were not about to sign any writing in effect confessing to under-reporting of gross income to the tax authorities. Instead, Michael Gatta on his kitchen table listed on a piece of red construction paper income and sales figures for 1983 indicating net income before partners' draw in the amount of $85,236. For the gross sales figures leading to this calculation he listed $314,860. He refused to sign the paper however and told the plaintiff that the paper was "to go no further than Bingham". David Bingham was the commercial loan officer handling the transaction for Nashua Trust Company.

Notwithstanding the lack of any signature on the tattered piece of red construction paper, the Nashua Trust Company in its wisdom proceeded to close and approve the financing of the transaction. Whether the same complied with pertinent Small Business Administration requirements for guaranteed loans is not an issue before this court. Likewise, the impropriety of alleged under-reporting of income to the taxing authorities by the defendants is not material to the decision of this court. Cf. *Kostelnik v. Roberts*, 680 S.W.2d 532 (Tex.App. 1984). Moreover, it is Falzone, not the Gattas, who is seeking affirmative relief from this court.

The testimony about the various representations back and forth between the plaintiff and the defendants, and the actual circumstances surrounding the creation of the "red construction paper" document referred to above, was highly conflicting. However, I am convinced by a review of the entire evidence in this record, and the testimony and demeanor of the key witnesses on the stand, that the credible evidence clearly establishes the facts as found above regarding those representations and the preparation of the document.

In the purchase transaction the plaintiff put in total cash of his own of only $2,000. The resulting debt service load, together with total operating costs, would require annually approximately $264,000 in gross revenues. Accordingly, such an operation obviously could not be covered from an annual gross of $239,000.

There is no direct independent evidence before the court that the gross receipts for 1983 were *not* the amount of $314,000 as represented by the defendants. On the stand they denied that the 1980 receipts were anything more than the $239,000 reported to the taxing authorities but I have already found and determined that it is credible that they represented to the plaintiff that they were not reporting all their cash receipts to the taxing authorities and that the true gross receipts for 1983 were the higher amount. The plaintiff did not offer any independent evidence establishing that the gross receipts for 1983 were less than the $314,000 claimed by the defendants in the representation prior to the sale. Of course, in an ordinary situation, the testimony of Michael Gatta on the stand that the actual receipts in 1983 were only $239,000, as reported to the taxing authorities, would normally be conclusive as an admission by a party-defendant. In this highly unique context however the court refuses to give that testimony binding effect and concludes as a factual matter that the plaintiff has failed to prove that the 1983 receipts were not as represented to him by the defendants.

Even if the court were to assume that the 1983 receipts were in fact $239,-000, the plaintiff is still not entitled to recovery on his fraud contention for various reasons. *One*, it does not appear to

this court that there is "reasonable reliance" upon a representation made by a party which clearly implies an illegal activity. That very fact should be a clear "red flag" to the party hearing the representation not to rely upon the truthfulness of the representation being made. At a minimum, it should require some independent inquiry and evaluation, of the economic facts being represented, before reasonable reliance could be claimed. *Two,* the evidence in this record establishes that the downfall of the restaurant operation was attributable to actions by the plaintiff after taking over the operation rather than through any misstatement of prior revenues.

For several months after taking over the operation the plaintiff commented to the defendants during their visits to the restaurant operation that the business was going "fine" and that he was pleased with the operation. The evidence does indicate that after the plaintiff took over there were increasing problems in the business due to deteriorating food quality and poor service to customers. Finally, the plaintiff himself could not, or would not, testify to the total amount of gross cash receipts *he* received in his conduct of the restaurant operation from September of 1984 to September of 1985. For all this court knows, or can tell from the record, the plaintiff's own gross receipts in the operation could have been $314,000 or more.

I therefore conclude that even if a misrepresentation as to the gross of the business is assumed, the plaintiff has failed to prove either reasonable reliance or reliance to his detriment. The record establishes that his damage occurred from his own mismanagement of the business and also the substantial debt load that he tried to cover in his operation with a minimal $2,000 cash capital investment into the same.

█ The plaintiff makes several additional contentions for recovery apart from the fraud ground. The lack of "fair consideration" contention does not deserve extended comment since the transaction in question involved a clearly arms-length bargaining transaction between knowledgeable businessmen. The further contention that the defendants' claim should be equitably subordinated to the business creditors of the plaintiff likewise must fail. There is no threshold showing that at the time of the transaction, in August of 1984, the defendants had any knowledge, or reason to believe, that the business operation being sold would ultimately and inevitably fail leaving unpaid existing trade creditors. Cf. *In re A.F. Walker & Sons Company, Inc.,* 46 B.R. 186 (Bankr.D.N.H.1985). On the contrary, the evidence indicates that the restaurant had been a profitable operation and there was no reason at that time to believe that it would not continue to be so.

The foregoing shall constitute findings of fact and conclusions of law within the provisions of Bankruptcy Rule 7052, and a separate judgment in accordance therewith shall be entered in favor of the defendants.